Ready, special J.
delivered the opinion of the court.
On the 24th day of January, 1832, Thomas Green became the security of FarleighB. Wade, the husband of Patsy Wade, in a note drawn in favor of Peter S. Decherd for $400, to fall due the 25th of December thereafter. To indemnify Green and secure him against loss on account of said suretyship, Far-leigh B. Wade executed a deed of trust, of the same date, to Joseph Huddleston as trustee, conveying his present crop of cotton, corn, fodder and oats, also his pending crop of cotton, corn, fodder and oats, his furniture, stock, See. and also a negro girl, Hanna,h, and her child. The deed of trust provided, if *548 Wade did not pay off said note at maturity, or release Green from his liability as surety, the trustee shall sell the property conveyed, or so much thereof as might be necessary and apply the proceeds to the payment of said debt, and the accruing interest and cost if any. It was also provided in the trust deed, that Wade should remain in possession'of the property conveyed until it might become necessary for the trustee to sell to effectuate the purposes of the trust. Wade did not pay the note at maturity or release Green from his liability as surety, but procured a renewal of the note, to which Green assented and executed the new note as surety. The note was renewed from time to time, Green still standing as surety, until the 19th of February, 1838, when the last renewal took place; the debt had then increased to $508 17, besides about 150 dollars which had been paid by Green, for which sum Wade and Green renewed their note, to fall due the 1st day of January, 1839. This last note was endorsed by Decherd to John C. Brazleton, and not being paid at maturity, Brazleton instituted suit thereon, in the ckcuit court of Franklin county, against Wade and Green as drawers and Decherd as endorser, and on the 13th day of May, 1839, recovered judgment against them for $519 17 debt and interest, besides costs of suit. On the 8th day of October a fi. fa. was issued on this judgment to the sheriff of Franklin county, which he levied on Hannah and her child, Washington, as the property of Farleigh B. Wade, but returned that the levy was made too late to sell. On the 14th day of March 1840, an alias fi,. fa. was issued and levied on the property of Thomas Green, but was returned without sale by order of the plaintiff.
When Green found payment of said judgment was likely to be coerced from him, he and Huddleston the trustee, took Hannah and her child, Washington, into possession, for the purpose of selling them under said trust deed, to pay off said judgment.
Before the sale could be made, and on the 7th day of April 1840, Patsy Wade filed her bill and enjoined the sale of Hannah and Washington. On the 23d day of May, 1840, a pluries fi. fa. was issued on said judgment, which was returned “settled in full the 15th June, 1840, by Thomas Green.” It appears *549 the negro Hannah, the mother of Washington, together with three others were previous to 1822, placed in the possession of Henry Hill, who resided in Franklin county, Tennessee, by his father-in-law Francis Modena of Virginia, and that two single daughters of Francis Modena, were then living with Hill, namely Patsy, who in 1822, married Farleigh B. Wade, and Caty who married Nathan Landridge. When Patsy married Wade, Hannah was placed in their possession, and she together with her increase remained in their undisputed possession from that time up to the time Green and Huddleston took Hannah and Washington into their possession, under the deed of trust, with the exception of one of Hannah’s children, which had been shortly before levied on as the property of Wade. During all the time said negroes were in the possession of Wade, he exercised acts of ownership over them, controlled them and used them as his own. When Caty Modena married Nathan Landridge, one of said negroes, was in like manner placed in their possession. Patsy Wade claims the right to enjoin the sale of the negroes Hannah and Washington, as cestui que trust under a deed of trust executed by Henry Modena, as agent and attorney in fact of Francis Modena, to Elijah D. Robbins as trustee, bearing date the 12th day of September, 1835. She alledges in her bill, that the possession which her husband had of said slaves, previous to that time was under a loan from her father, Francis Modena; that the deed of trust, to Robbins was executed in pursuance of the provisions of a power of attorney from her father to Henry Modena, dated the 6th July 1835, authorizing him to taire said negroes into his possession, together with others then heldb3>- his two sons-in-law, and to make such division and conveyance of them as he might deem necessary to secure the use of them to his three daughters, during their natural lives and to their lawful heirs in remainder after their death; that in carrying into effect the power conferred on him, the said Henry Modena called on four disinterested persons, Thomas Green being one of them, to value said slaves, and make a division of them; that Green performed the required service without setting up any lien on Hannah and Washington; that the said two negroes were on the date of the deed of trust to Rob *550 bins delivered to her, and she has remained in possession of them, holding and claiming them as her own, until they were taken out of her possession by Green and Huddleston.
She alledges that her husband F. B. Wade, never had any title to said slaves; that the conveyance in trust to Huddleston is fraudulent and void, in consequence of consumable articles which it purports to convey; that even if it be not void for fraud, Green lost his lien by assisting in making the division and valuation, and standing by when the conveyance was made intrust to Robbins for her use, without asserting his lien, and that she has a good title by virtue of the statute of limitations, having been in possession claiming them as her own more than three years from the date of the deed of trust to Robbins.
It is insisted on the part of Green, that Wade’s possession of the slaves, previous to the deed of trust of the 20th of January 1832, for his indemnity, was by virtue of a gift from Francis Modena, and if not by gift, it was under a loan, which was not declared by deed or will in writing, proved and recorded according to the provisions of the act of 1801, ch. 25, sec. 2, and under which loan he had continually held possession for more than five years, which vested the title in him, so far as his creditors and purchasers from him are concerned.
Thomas Green died intestate shortly after he filed his’answer to the bill of Patsy Wade. The suit was revived against James F. Green, who was appointed his administrator, and on the 27th day of July 1840, James F. Green administrator, filed his cross bill against Patsy Wade and others seeking to be substituted to the lien which the judgment creditor Brazleton had acquired, on the negroes in controversy, previous to the obtaining injunction by Patsy Wade. He also insists upon the lien created by the deed of trust, executed by Wade to Huddleston as trustee, and asks the court to decree that the negroes be sold for the benefit of his intestate’s estate, either by virtue of the lien of Brazleton’s execution or under the lien of the trust deed to Huddleston.
Mrs. Wade sets up the same matters in defence to the cross bill, which she had previously alledged in her injunction bill, and also relies upon the additional facts, that Henry Hill had in *551 February 1824, made a declaration in writing of the loan of the slave Hannah to Farleigh B. Wade, which was duly acknowledged by him certified and registered in Franklin county , and that on the 3d of October 1823, her father had executed a power of attorney to Henry Modena, authorizing him to take Hannah into his possession, and hire her out from year to year, subject to his farther order.
There is no proof of the legal existence of this last mentioned paper. Such a paper is exhibited with the answer, but it never was legally proved and recorded, and there is no proof made in relation to it. It can, therefore, have no effect upon the rights of the parties, and need not be further considered.
It is also insisted on the part of Mrs. Wade, that the transaction with Decherd, in its inception, and at the several renewals of the note, was usurious; and if the negroes in question are subject to the payment of any thing, to Green’s estate, on either of the grounds relied on, it is for a much smaller sum than that claimed.
The first question claiming attention is, as to the character of Farleigh B. Wade’s possession of the negroes in controversy from 1822, to the 24th January, 1832, the date of the deed of trust executed by him to Huddleston.
It appears that Hannah, together with other slaves, was placed in the possession of Henry Hill by his father-in-law, Francis Modena, at some period previous to 1822, the precise object of which does not appear from the proof. It seems Hill was removing, or had removed from Virginia to Tennessee. His wife’s two sisters had removed with and taken up their residence in his family. They had left an aged father behind them, and owing to the great distance at which they were separated, it was not probable there would be much more personal intercourse between them, if indeed, owing to the additional fact of his advanced age, they ever saw him again.
Under the circumstances which surrounded the two single daughters, it could not be reasonably supposed, they would remain in that state many years; and a father who had the means, when his daughters were leaving his parental roof to take up their residence at so great a distance from him, and most likely *552 never to return again, could scarcely overlook tbe propriety of sending with them a portion of the property which he had toiled through a long life to secure for his children,' and which would be so essential to their establishment when they should become themselves heads of families. Certain it is, the ne-groes were not all sent for the exclusive benefit of Hill. A portion of them may have been, and no doubt was, as it seems he retained a part of them. But as the two single daughters respectively married off, they were each placed in the possession of one of the negroes, which they continued to hold. These circumstances create a strong presumption, that the negroes when placed with Hill by Modena, were intended as. a gift to his daughters, or that they were to be held by Hill as his agent, and given off to the daughters as they were married. If such were not the fact, Hill or his family doubtless knew it; and having no interest in this controversy, would have been competent witnesses. The importance of their testimony to establish the converse of the presumption growing out of the circumstances, must have been known to Mrs. Wade and the fact that their testimony is not introduced, and its absence unaccounted for, strengthens the presumption of the gift.
Perhaps the fact that Wade and wife were placed in possession of Hannah at the time, or very shortly after their marriage, without any explanation accompanying the delivery of possession, and that possession being continued for a number of year, ought of itself to be taken as establishing a gift. Before the passage of our statute of 1831, ch. 90, which cannot operate in the question under consideration in this case, it was repeatedly held that where a father sent property, as negroes and the like to his son-in-law and daughter or with them, without any explanation as to the manner in which they were to hold it, the law presumed it was given. Stump vs. Roberts, Cook’s R. 353. Stewart vs. Cheatham and wife, 3 Yerg. 60. We are, therefore, disposed to hold that the possession of Wade and wife of Hannah and increase was in pursuance of a parol gift from the wife’s father, and consequently that said negroes were subject to the payment of the husband’s debts or to be conveyed by him.
Secondly, if there was no evidence of a gift, we could then *553 regard tlie husband’s possession in no other light than as by an indefinite loan. Indeed Mrs. Wade, both in her bill and her answer to the cross bill, expressly declares that Hannah was loaned to her husband by her father. If there was a loan it continued for more than five years, and unless it was declared by deed, or will in writing, proved and registered, it comes within the provisions of the statute of 1801, ch. 25, sec. 2. It is not contended that there was any declaration of a loan by deed or will, made by Francis Modena from whom the property came, but it is insisted that Henry Hill made a declaration of a loan by deed duly proved and recorded in Franklin county, which prevents the operation of the statute of 1801.
The alledged declaration of a loan by him is as follows:
“Winchester, Tennessee, February 1834. The following negroes I brought to Tennessee, as the property of Francis Mo-dena of Albermarle county, Virginia, Eada and Hannah, and since their arrival in this county, Eada now in the possession of Nathan Landridge has had two children, to wit, Charles and Clarissa; Hannah is in possession of Farleigh B. Wade. Both of the above named persons, Landridge and Wade intermarried with the daughters of said Modena. Landridge intermarried with Caty and Wade with Patsy, daughters of said Modena. No transfers of the property has been made.
HENRY HILL, [Seal.]”
This instrument was duly acknowledged, certified and recorded in Franklin county, in 1824. Is it such a declaration of a loan as is contemplated by the act of 1801, ch. 25, sec. 2. It distinctly announces at its commencement, that the property specified therein does not belong to him, (Hill.) It does not purport to be made by him as agent of Francis Modena, or that he has any authority to make such a declaration, nor does it in fact on its face purport to be a declaration of a loan. Every thing it asserts may be true and yet not inconsistent with a gift or a verbal loan from Francis Modena. We apprehend the true construction of the act of 1801, ch. 25, sec. 2, is that the owner of the property loaned, shall be a party to the deed or will declaring the loan. If such is not the meaning of the act, then it would follow, that an entire stranger in interest may *554 make the declaration of a loan by deed after the possession of the property had been changed, and without the knowledge of the persons interested, and it would be a valid declaration of loan, which certainly never was intended.
We cannot regard this instrument as a declaration of a loan within the meaning of the act of 1801. And therefore whether we consider Wade’s possession from 1822 to 1832, as by gift or by a verbal loan; we are of opinion that he had a right to convey on the 24th of January 1832, and that he did convey Hannah and her child on that day, is proved by the production of the deed of trust to Huddleston duly authenticated.
But it is said that this deed of trust is fraudulent and void in law, on account of conveying articles consumable by the use. We recognize the correctness of the decisions heretofore made by this court, on the subject and as between the creditors of B. F. Wadeontheone part, and the trustee and cestui quetncstiathis deed on the other, we should not hesitate to declare it fraudulent and void in law.
For example, John G. Brazleton who was a creditor of F. B. Wade, had a right to levy on and sell the property conveyed. But this is not a contract between the persons claiming under the deed of trust and the creditors of F. B. Wade, or a purchaser from him. Mrs. Wade or her trustee does not occupy either of these relations. She is a volunteer, and cannot be regarded as having any claims against the trust deed, superior to those of F. B. Wade.
Unquestionably, as between him and his trustee and cestui que trust, the deed is valid. By the express provision of the statute of frauds, conveyances made “to the intent or purpose to delay, hinder or defraud creditors, &c.,” “shall be deemed and taken only as against the person or persons, his, her or their heirs, successors, executors, administrators or assigns, and every of them whose debts, suits, demands, estates, interest,” &c. “shall or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void.”
Again, it is insisted that though the deed of trust to Huddle-ston may have created a valid lien on the property in question, that lien was lost and destroyed by the conduct of Green for *555 whose benefitit was executed. It is said that he aided and assisted in making a division of the negroes, which Francis Mo-dena had by power of attorney authorized his son Henry to convey to the separate use of Mrs. Hill, Mrs. Landridge and Mrs. Wade for life, remainder to their heirs, (Hannah and Washington being a part of them;) that he stood by and saw the conveyance made in trust to Robbins, without setting up his lien, and in consequence of which, he shall from thenceforth be prevented from asserting his lien. We do not think the argument is sustained by the proof. Joseph Acldin proves, “Thomas Green was present and assisted in fixing the value of the negroes.” He also proves that Green said he had some delicacy in having any thing to do with it, on account of his having a lien on some of the negroes. This remark by Green was addressed to the witness, and was made in the room where all the parties interested in the valuation were present, except Hill. It can, therefore, hardly be supposed that the remark was not heard by them; though the witness says, he does not think Green made his lien a formal objection before the parties.
. But this is not a case for the applicati on of the doctrin e, that the who stands by having a claim to property, and sees a third person expend his money in the purchase of it, in ignorance of any in-cumbrance thereon, without making his claim known, shall af-terwards be prevented from asserting his claim against such purchaser.
Neither Robbins the trustee, nor Mrs. Wade, were purchasers of the property; neither paid or contracted to pay any thing. It was a valuation of property, the title to which had been previously vested, made possibly for the purpose of making equal the portions of the three sisters in someway. The conveyance to Robbins cannot be justly regarded in any other light, than as a contrivance to secure to Wade’s family the use and benefit of property, which was in point of fact his, or which had become his, at least so far as it was necessary for the payment of his debts, and for the purpose of keeping his creditors, who had become numerous, at arm’s length. The same may be said of the declaration by deed made and recorded by Henry Hill, as well as of the pretended power of attorney from Francis Mode- *556 na to Hill in 1823, of all which nothing is heard until after Wade was embarrassed with debts, in which situation he was found very shortly after his marriage. Therefore, even if it be true, that Green did not make his lien known at the time referred to, it was immaterial.
The next question to be noticed is, as to the statute of limitations.
It is insisted in behalf of Mrs. Wade, that she has held, uniii-* terrupted possession of, and claimed the negroes in controversy adversely, for more than three years from the execution of the deed of trust to Robbins, until they were taken into possession by Green and Huddleston, whereby her title, even if it -was before imperfect, became perfect. If Robbins, the trustee, had held possession for three years, claiming adversely, there is no question but that the title would have been vested in him, and if Mrs. Wade held possession under him and by virtue of the trust deed to him, her possession would have the same effect. How are the facts? Wade, the husband, had previously conveyed the same negroes in trust to Huddleston. The deed provided, that he should remain in possession of them, until it became necessary for the trustee to take them into his possession to sell. Then from the execution of this deed, Wade was holding under and for Huddleston, his trustee. While he was thus holding, Henry Modena, the agent of Francis Modena, executed a conveyance in trust to Robbins, reciting that the ne-groes Hannah and Washington were then in the possession of FarleighB. Wade, and provided, that Patsey Wade, his wife, should be entitled to their use for and during her natural life, remainder to her lawful heirs. To this last mentioned deed Farleigh B. Wade was not a party. The proof does not show the negroes were out of his possession at any time from the 24th January, 1832, the date of the trust deed to Huddleston, until they were taken possession of by Pluddleston and Green, or his possession in any manner interrupted, except when Brazle-ton’s execution was levied on them, on the 7th of January, 1840. On the contrary, it .shows positively he was holding possession all the time; and it shows no difference between the character ,of his possession before and .after the deed to Robbins. We *557 have seen that Wade took and held in subjection to the trust deed of the 24th of January, 1832. There was nothing at any time, necessarily inconsistent, between his possession and the rights of those claiming under that deed; and there is no evidence of his even holding in hostility to it. It was his duty to hold under it, and the law in thg absence of proof to show the reverse, will consider him as holding in that capacity in which, by law, he should have held. Mrs. Wade’s possession, in order to be effectual under the statute, must have been adverse to the rights created by the deed to Huddleston, and adverse to all persons claiming to hold under it. Then, suppose she was equally in possession with her husband, which is conceding her fully as much as can be claimed for her, how can it be said she was holding adversely to her husband; who, we have seen, was holding in subjection to the deed to Huddleston?
Saunders Faris proves, that at some period between the date of the deed of trust to Robbins, and the time of taking his deposition, Wade and wife were separated, and it does not appear that during the separation, she had possession or control of the negroes. This circumstance is material to show the character of Wade’s possession, and taking all the proof together, it forces the conviction on the mind, that the possession of Mrs. Wade was none other than such asa wife has of property belongingto or in possession of her husband. The conclusion then al which we arrive is, that there has been no such possession on the part of Mrs. Wade as can create a bar under the statute of limitations to the lien under the deed of trust to Huddleston. We are also of opinion that the complainant in the cross bill, has a right to be substituted to the lien of John G. Brazleton upon this property in controversy, acquired by virtue of his execution against Farleigh B. Wade and Thomas Green. It appears that Green was the security of Wade; that Brazleton recovered a valid judgment against them in the circuit court of Franklin county, on which he caused an execution to be issued and actually levied upon this property; that execution was returned without a sale of the property; and afterwards, an alias and then a ylurics execution was issued. The latter of which was returned satisfied by Thomas Green. The issuance of *558 the execution, without the levy on the negroes,- created a lien on them in favor of the execution creditor; and it is a well settled principle with a court of equity, that a surety who has paid money for his principal, may be substituted to the lien which the creditor may have had on the property of the principal debtor. The case of McNairy vs. Eastland and others, 10th Yerg. 310, is directly in point upon this branch of the case, and wc need not go further for authority.
"The question of usury in the transaction with Decherd, raised by Mrsi Wade in her answer, cannot avail her any thing. We have no doubt of the usurious character of the transaction. The testimony of Decherd himself establishes the fact, and if the question were raised at the proper time, between the debtor and the creditor, attempting to enforce his usurious demand, there could be no hesitation to give relief against all the excess over six per cent.
But the question is now made against a surety who has in good faith paid off the demands of the original creditor, and is seeking to be reimbursed for the money he has advanced.
We apprehend there is no principle in law or equity which under the circumstances could bring the usurious character of the debt paid to bear upon the surety’s right to redress against his principal.
The decree of the chancellor will be affirmed.